NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
:
CHANEL, INC., a New York corporation :
and FAMOUS STARS AND STRAPS, :
INC., a California corporation, :
: Civil Action No. 08-2005 (JAG)
Plaintiff, :
: **OPINION**
v. :
:
ENS JEWELRY, INC., a New Jersey :
corporation d/b/a ENS JEWELRY and :
JUNG LEE a/k/a SHANNEN LEE, an :
individual, d/b/a ENS JEWELRY, :
:
Defendant. :
_____:

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion, (Docket Entry No. 17), filed by plaintiffs Chanel, Inc., and Famous Stars and Straps, Inc. (collectively, "Plaintiffs"), seeking entry of default judgment against defendants, ENS Jewelry, Inc. and Jung Lee (collectively, "Defendants"), pursuant to FED. R. CIV. P. 55(b). For the following reasons, Plaintiffs' motion will be granted and damages shall be awarded.

**I. FACTS**

In 2008, as part of its ongoing efforts to curb the sale of counterfeit Chanel products,

1

plaintiff Chanel ("Chanel") retained Investigative Consultants, Inc. (Compl. Hahn Decl. ¶ 10.)[1] Shortly thereafter, Karin Tiler ("Tiler"), an investigator employed by Investigative Consultants, Inc., traveled to Las Vegas to investigate suspected sales of counterfeit Chanel products. (Compl. Tiler Decl. ¶ 4.) After arriving, Tiler visited Defendants' booth at the ASD/AMD trade show. (Id.) At the booth, Tiler observed various items of jewelry for sale, including "approximately 25 Chanel branded necklaces and 30 pairs of Chanel branded earrings." (Id.) Tiler was then informed by a woman working in the booth that Defendants "sell their costume jewelry items in wholesale quantities," that "Defendants' [sic] had a substantial quantity of Chanel branded costume jewelry in stock [in their New Jersey warehouse]," and that "the Chanel branded costume jewelry items offered for sale [by] the Defendants were 'copies' however of 'very good quality.'" (Id. ¶ 5.) Before leaving, Tiler purchased a Chanel branded necklace for ten dollars and was given a price list and a business card. (Id. ¶¶ 4–5.)

Tiler sent the Chanel branded necklace she purchased at the Defendants' trade show booth to Chanel representatives in New York. (Id. ¶ 6.) Adrienne Hahn Sisbarro ("Hahn"), the Director of Legal Administration for Chanel in New York, analyzed the necklace and determined that it was a "non-genuine Chanel product." (Compl. Hahn Decl. ¶ 12; Compl. Tiler Decl. ¶ 7.)

In April 2008, Investigative Consultants, Inc. was retained by plaintiff Famous Stars and Straps, Inc. ("Famous") to "investigate the suspected sale of counterfeit Famous products by Defendants." (Compl. Tiler Decl. ¶ 3.) As part of this new investigation, and the ongoing Chanel investigation, Tiler traveled to Defendants' Clifton, New Jersey location. (Id. ¶ 8.) After

---

[1] Throughout Plaintiff's submissions, the declaration of Adrienne Hahn Sisbarro is referred to as the "Hahn" declaration. To avoid confusion, this Court will adopt the same nomenclature.

arriving, she observed a number of brown boxes in a first floor room. (Id. ¶ 9.) To her, the room appeared to be a "warehouse or storage facility." (Id.) On the second floor, Tiler was shown the Defendants' manufacturing process. (Id. ¶¶ 10–13.) Tiler observed an unidentified woman, sitting at a computer which was displaying the Chanel "CC Monogram," manufacturing Chanel branded necklaces by inserting a blank pendant into an engraving machine connected to the computer, and then engraving the Chanel monogram onto it. (Id. ¶ 10.) The process took less than two minutes and there were several such engraving machines in the room. (Id.) Tiler was then informed by an employee that "Defendants have the ability to manufacture their jewelry items and belt buckles bearing 'any name brand.'" (Id. ¶ 12.) The employee then took a blank belt buckle, inserted it into a larger engraving machine, and engraved it with one of Famous' marks. (Id.)

      Tiler was then escorted to a showroom, where she observed several different Chanel-branded navel rings, each bearing Chanel's "CC Monogram." (Id. ¶ 13.) The employee who was escorting Tiler stated that Defendants imported their navel rings from China. (Id.) According to that employee, Defendants manufactured most of their Chanel jewelry — as opposed to importing it from China — because "'it was dangerous' to import the Chanel jewelry items from China." (Id.) Before departing, Tiler purchased two dozen Chanel branded necklaces of varying sizes for five and six dollars each. (Id. ¶ 14.) Tiler also purchased the Famous branded belt buckle for ten dollars. (Id.)

      Tiler delivered the Chanel branded necklaces to Chanel's New York headquarters, where Hahn analyzed them. (Compl. Hahn Decl. ¶¶ 13–14.) Hahn determined that the purchased necklaces were "non-genuine Chanel products." (Id. ¶ 14; Compl. Tiler Decl. ¶ 16.) Tiler then

3

delivered the Famous branded belt buckle to Famous' headquarters. (Compl. Tiler ¶ 17.) Bill Nosal ("Nosal"), the Chief Operating Officer for Famous, inspected the belt buckle and determined that it was a "non-genuine Famous product." (Compl. Nosal Decl. ¶ 12; Compl. Tiler Decl. ¶ 17.)

On April 2, 2008, Robert Holmes ("Holmes"), an investigator for IPCybercrime.com LLC, conducted a search through the "corporate records division of the Secretary of State for the State of New Jersey" for defendant ENS Jewelry, Inc. (Compl. Holmes Decl. ¶¶ 2–4.) As a result of this search, Holmes learned that defendant ENS Jewelry, Inc. is a "corporation organized under the laws of the State of New Jersey." (Id. ¶ 4.) Further inquiry revealed a New Jersey address and the name of the owner: defendant Shannen Lee ("Lee"). (Id. ¶ 5.) A final search through Whitepages.com revealed that the phone number from defendant ENS Jewelry Inc.'s business card belonged to the building which Tiler had visited a day earlier. (Id.) The mobile phone number from the business card was also traced back to Lee. (Id.)

On April 12, 2008, Plaintiffs commenced the instant action against Defendants by filing their complaint. (Docket No. 1.) After this filing, but before summons were issued, (Docket No. 2), this Court granted Plaintiffs' application for, among other things, a temporary restraining order against Defendants and for a seizure order against Defendants. (Docket No. 4.) On April 28, 2008, Defendants were served with the summones. (Docket No. 9.) Additionally on April 28, 2008, pursuant to the seizure order, the Passaic County Sheriff's Department ("Sheriff's Department") seized from Defendants' facility "over 23,000 items bearing and/or offered for sale

4

under both the Chanel and Famous Marks." (Vafaeisefat Decl. ¶ 4.)[2]

The Sheriff's Department also seized several pieces of equipment used to manufacture counterfeit Chanel and Famous products. (Id.) Vafaeisefat assisted the Sheriff's Department during the execution of the seizure order. (Id.) Afterwards, Vafaeisefat sent photographs of the Chanel branded goods to Chanel's headquarters in New York, and photographs of the Famous branded goods to Famous' headquarters in California. (Id. ¶ 5.) Hahn analyzed the photographs that were sent to New York and concluded that the products pictured therein were "non-genuine Chanel products." (Hahn ¶ 16.) Nosal analyzed the photographs that were sent to California and concluded that the products pictured therein were "non-genuine Famous products." (Nosal Decl. ¶ 14.)

Plaintiffs moved for entry of Clerk's default against Defendants on June 4, 2008. (Docket Nos. 11–12.) The motion was granted, and the Clerk entered default against Defendants on June 5, 2008. More than five months later, Plaintiffs filed this motion for entry of final default judgment. (Docket No. 17.)

## II. STANDARD

A district court can enter a default judgment, pursuant to FED. R. CIV. P. 55(b)(2). This rule states, in pertinent part:

> In all other cases, the party must apply for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 3 days before

---

[2] Sacha Vafaeisefat ("Vafaeisefat") is an investigator employed by Investigative Consultants, Inc. (Vafaeisefat Decl. ¶ 2.)

> the hearing. The court may conduct hearings or make referrals–preserving any federal statutory right to a jury trial–when, to enter or effectuate judgment, it needs to:
> (A) conduct an accounting;
> (B) determine the amount of damages;
> (C) establish the truth of any allegation by evidence; or
> (D) investigate any other matter.

FED. R. CIV. P. 55(b)(2). Further, the ultimate decision whether to enter default judgment in any given case "is left primarily to the discretion of the district court." Hritz v. Woma Corp., 732 F.2d 1178, 1180 (3d Cir. 1984). See also F.T.C. v. Packers Brand Meats, Inc., 562 F.2d 9, 11 (8th Cir. 1977).

"Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint." United States v. Gant, 268 F. Supp. 2d 29, 32 (D.D.C. 2003) (citing Brock v. Unique Racquetball & Health Clubs, Inc., 786 F.2d 61, 65 (2d Cir. 1986)). Default does not establish liability for the amount of damages claimed by the plaintiff. Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation."). "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999).

The district court has considerable latitude in determining the amount of damages. Jones v. Winnepesaukee Realty, 990 F.2d 1, 4 (1st Cir. 1993). In determining the amount, the district court may conduct a hearing. FED. R. CIV. P. 55(b)(2). The court is not required to do so, however, "as long as it ensure[s] that there [is] a basis for the damages specified in the default judgment." Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111

(2d Cir. 1997). "It is familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly." Pope v. United States, 323 U.S. 1, 65 (1944).

### III. JURISDICTION

Before default judgment may be entered against a party that has not filed responsive pleadings, "the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." Williams v. Life Sav. & Loan, 802 F.2d 1200, 1203 (10th Cir. 1986).

#### A. Subject Matter Jurisdiction

As this case involves a dispute regarding trademarks, this Court finds that subject matter jurisdiction is proper under 15 U.S.C. § 1121 ("The district . . . courts of the United States shall have original jurisdiction . . . of all actions [regarding trademarks and arising under Chapter 22 in Title 15 of the United States Code]."), 28 U.S.C. § 1331, and 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to . . . copyrights and trademarks.").

#### B. Personal Jurisdiction

In the instant case, defendant ENS Jewelry, Inc. has its principal place of business in Clifton, New Jersey and is also incorporated under the laws of New Jersey. (Compl. Holmes Decl. ¶¶ 4–5.) Thus, this Court finds that it can exercise personal jurisdiction against defendant ENS Jewelry, Inc. properly. 28 U.S.C. § 1332(c)(1). However, Plaintiffs do not allege in their

complaint — nor do they demonstrate through any of the submitted exhibits — that defendant Jung Lee is a resident of New Jersey. Thus, this Court must now consider whether it can exercise personal jurisdiction over defendant Jung Lee as an out-of-state defendant.

To determine if personal jurisdiction is permitted over an out-of-state defendant a federal court first looks to the forum state's long-arm statute. Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004). In New Jersey, the long arm statute permits the exercise of personal jurisdiction to the fullest limits of due process, as defined under the Constitution of the United States. Id. Therefore, in New Jersey, federal law defines the parameters of a court's in personam jurisdiction. IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998). Thus, this Court must determine whether the exercise of jurisdiction violates the Due Process Clause of the Fourteenth Amendment. Miller Yacht Sales, 384 F.3d at 96.

The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only where "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235 (1958)). It is the burden of the plaintiff to prove that the defendant has purposefully availed itself of the forum state. Burke v. Quartey, 969 F. Supp. 921, 924 (D.N.J. 1997).

To prove that a defendant has purposefully availed itself of the forum state, a plaintiff may rely upon a defendant's specific contacts with the forum state. The burden to produce actual evidence of the defendant's contacts with the forum state rests on the plaintiff. Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984). Personal jurisdiction pursuant to such contacts is known as specific jurisdiction. Specific jurisdiction is invoked when

a claim is related to or arises of out the defendant's contacts with the forum.  Helicopteros Nacionales de Colombia, S. A. v. Hall, 466 U.S. 408, 416 (1984); Dollar Sav. Bank v. First Sec. Bank of Utah, 746 F.2d 208, 211 (3d Cir. 1984).

A court must first determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).  What constitutes minimum contacts varies with the "quality and nature of defendant's activity."  Hanson, 357 U.S. at 253.  In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus on the "relationship among the defendant, the forum, and the litigation."  Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984).  There must be at least "a single deliberate contact" with the forum state that relates to the cause of action.  United States Golf Ass'n v. United States Amateur Golf Ass'n, 690 F. Supp. 317, 320 (D.N.J. 1988).  The unilateral acts of the plaintiff, however, will not amount to minimum contacts.  Helicopteros Nacionales de Colombia, 466 U.S. at 414; Hansen, 257 U.S. at 253.  Assuming minimum contacts have been established, a court must inquire whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"  Burger King Co., 471 U.S. at 476 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)); see also Pennzoil Prod. Co. v. Colelli & Assoc. Inc., 149 F.3d 197, 201 (3d Cir. 1998).

For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state.  World-Wide Volkswagen Corp., 444 U.S. at 292 (1980).  To determine reasonableness, a court considers the following factors: a) the burden on the defendant; b) the forum state's interest in adjudicating the

9

dispute; c) the plaintiff's interest in obtaining convenient and effective relief; d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and e) the shared interest of the several States in furthering substantive social policies.  Id.  Only in "rare cases [do the] minimum requirements inherent in the concept of 'fair play and substantial justice' . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities."  Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County, 480 U.S. 102, 116 (1987) (citing Burger King Co., 471 U.S. at 462).

If the plaintiff cannot establish specific jurisdiction, a court may exercise general jurisdiction over the defendant if the defendant has maintained "continuous and systematic" contacts with the forum state.  Helicopteros Nacionales de Colombia, 466 U.S. at 416.  To establish general jurisdiction, the plaintiff "must show significantly more than mere minimum contacts" with the forum state.  Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987).  Moreover, the facts required to establish general jurisdiction must be "extensive and persuasive."  Reliance Steel Products Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982).

The instant suit arises directly from defendant Jung Lee's activities within New Jersey, as the operator of ENS Jewelry, Inc.  (Compl. ¶ 4; Compl. Holmes Decl. ¶ 5.)  As a result of these extensive activities, this Court also finds that it can exercise personal jurisdiction over defendant Jung Lee properly.

### IV. ANALYSIS

Defendants have failed to appear, or otherwise plead, in response to the Complaint, which was filed on April 24, 2008 and served on Defendants on April, 28 2008.  (Docket Entry Nos.

1–2, 9.)  Plaintiffs appropriately filed an application for entry of default with this Court, (Docket Entry No. 11–12), prior to filing their motion for an entry of default judgment, (Docket Entry No. 17).  This Court finds that default judgment is appropriate under FED. R. CIV. P. 55 (b)(2), on all counts of the complaint.

## V.  RELIEF

### A.  Permanent Injunction

Plaintiffs seek a permanent injunction against Defendants to prevent future infringement, pursuant to 15 U.S.C. § 1116.  Based on the facts presented in this case — in particular, the sheer amount of counterfeit merchandise recovered from Defendants' facility — this Court finds that such an injunction is necessary to prevent further violation of Plaintiffs' trademarks.  15 U.S.C. § 1116(a).

### B.  Chanel's Damages

Chanel seeks a total of $391,795.90 in damages, pursuant to 15 U.S.C. § 1117.  This amount includes: $375,390.90 in statutory damages; $8,711.75 in reasonable attorneys' fees; $7,487.28 in reasonable investigative fees; and $206.00 in costs.

This Court finds that, pursuant to 15 U.S.C. § 1117, $375,390.90 is a reasonable amount for the statutory damages owed to Chanel.  In reaching this figure, this Court first calculated reasonable statutory damages under 15 U.S.C. § 1117(c), and then trebled it, pursuant to 15 U.S.C. § 1117(b).  That is, pursuant to 15 U.S.C. § 1117(c), this Court added the total number of counterfeit Chanel goods sold to Tiler (25), (Compl. Tiler Decl. ¶¶ 4–5, 14), to the total number of counterfeit Chanel goods confiscated from Defendants' New Jersey facility (22,521),

(Vafaeisefat Decl., Ex. 1).  This total, 22,546, was then multiplied by the average price of all counterfeit Chanel products sold by Defendants ($5.55).  (See Tiler Decl., Ex. 1, 7.)  This product ($125, 130.30) is the baseline amount of damages under 15 U.S.C. § 1117(c).  Pursuant to 15 U.S.C. § 1117(b), the baseline amount is multiplied by three as this Court finds that Defendants were willfully engaging in their counterfeiting activities; even admitting as much to Tiler.  (Compl. Tiler Decl. ¶ 5.)  This operation yields a final amount of $375,390.90.

Since Defendants were willfully engaging in their counterfeiting activities, this Court also finds that an award of reasonable attorneys' fees is proper, pursuant to 15 U.S.C. § 1117(b).  In this case, total attorneys' fees for Plaintiffs amount to $17,423.50.  (Halpern Decl. ¶ 9; Gaffigan Decl. ¶ 4.)[3]  These rates are equal to or less than the rates for comparable services. Also, this Court is satisfied that the attorneys made "every reasonable effort" to minimize the hours spent on the case.  (Halpern Decl. ¶ 10; Gaffigan Decl. ¶ 6.)  Chanel is thus entitled to half of the total attorneys' fees, which is $8,711.75.

Additionally, Chanel requests that it be paid reasonable investigative fees.  Since investigative fees ought to be considered part of the attorneys' fees, this Court will award Chanel one half of the total investigative fees in this case.  Fila USA v. RunRun Trading Co., No. 95-7144, 1996 U.S. Dist LEXIS 6893, at *11 (S.D.N.Y. 1996); Louis Vuitton S.A. v. Downtown Luggage Ctr., 706 F. Supp. 839, 842 (S.D. Fla. 1988).  See also 130 Cong. Rec. H12076, 12083 (Oct. 10, 1984) ("[T]o the extent that an investigator acts under the direction of an attorney . . . his or her fees may be recovered by a prevailing plaintiff as part of an award of attorney fees.")

---

[3] Gabriel H. Halpern ("Halpern") and Stephen M. Gaffigan ("Gaffigan") are Plaintiffs' attorneys.  (Halpern Decl. ¶ 1; Gaffigan Decl. ¶ 1.)

(Joint Explanatory Statement on Trademark Counterfeiting Legislation).  The total investigative fees in this case — between Tiler, Holmes, and Vafaeisefat — were $14,974.56.  (Tiler Decl. ¶ 20; Holmes Decl. ¶ 7; Vafaeisefat Decl. ¶ 6.)  Thus, this Court will award Chanel $7,487.28 in investigative fees.

Finally, Chanel requests that this Court award costs, pursuant to 15 U.S.C. § 1117 (a).  As this recovery is subject to the "principles of equity," 15 U.S.C. § 1117(a), this Court holds that Chanel should be awarded half of the total costs of the action: $206.00.  (Halpern Decl. ¶ 9; Gaffigan Decl. ¶¶ 9–11, Ex. 2.)

### C.  Famous' Damages

Famous seeks a total of $76,555.03 in damages, pursuant to 15 U.S.C. § 1117.  This amount includes: $60,150.00 in statutory damages; $8,711.75 in reasonable attorneys' fees; $7,487.28 in reasonable investigative fees; and $206.00 in costs.

This Court finds that, pursuant to 15 U.S.C. § 1117, $60,150.00 is a reasonable amount for the statutory damages owed to Famous.  In reaching this figure, this Court first calculated reasonable statutory damages under 15 U.S.C. § 1117(c), and then trebled it, pursuant to 15 U.S.C. § 1117(b).  That is, pursuant to 11 U.S.C. §  1117(c), this Court added the total number of counterfeit Famous goods sold to Tiler (1), (Compl. Tiler Decl. ¶¶ 4–5, 14), to the total number of counterfeit Famous goods confiscated from Defendants' New Jersey facility (2,005), (Vafaeisefat Decl., Ex. 1).  This total, 2,006, was then multiplied by the price of the Famous belt buckle purchased by Tiler from the Defendants ($10).  (Compl. Tiler Decl. ¶¶ 4–5.)  The product of this operation ($20,050.00) is the baseline amount of damages under 15 U.S.C. § 1117(c).  Pursuant to 15 U.S.C. § 1117(b), the baseline amount is multiplied by three as this Court finds

13

that Defendants were willfully engaging in their counterfeiting activities, even admitting as much to Tiler. (Compl. Tiler Decl. ¶ 5.) This operation yields a final amount of $60,150.00.

Since Defendants were willfully engaging in their counterfeiting activities, this Court also finds that an award of reasonable attorneys' fees is proper, pursuant to 15 U.S.C. § 1117(b). In this case, total attorneys' fees for both plaintiffs amount to $17,423.50. (Halpern Decl. ¶ 9; Gaffigan Decl. ¶ 4.) These rates are equal to or less than the rates for comparable services, and the attorneys made "every reasonable effort" to minimize the hours spent on the case. (Halpern Decl. ¶ 10; Gaffigan Decl. ¶ 6.) Famous is thus entitled to half of the total attorneys' fees, which is $8,711.75.

Additionally, Famous requests that it be paid reasonable investigative fees. Since investigative fees ought to be considered part of the attorneys' fees, this Court will award Famous one half of the total investigative fees in this case. Fila USA v. RunRun Trading Co., No. 95-7144, 1996 U.S. Dist LEXIS 6893, at *11 (S.D.N.Y. 1996); Louis Vuitton S.A. v. Downtown Luggage Ctr., 706 F. Supp. 839, 842 (S.D. Fla. 1988). See also 130 Cong. Rec. H12076, 12083 (Oct. 10, 1984) ("[T]o the extent that an investigator acts under the direction of an attorney . . . his or her fees may be recovered by a prevailing plaintiff as part of an award of attorney fees.") (Joint Explanatory Statement on Trademark Counterfeiting Legislation). The total investigative fees in this case — between Tiler, Holmes, and Vafaeisefat — were $14,974.56. (Tiler Decl. ¶ 20; Holmes Decl. ¶ 7; Vafaeisefat Decl. ¶ 6.) Thus, this Court will award Famous $7,487.28 in investigative fees..

Finally, Famous requests that this Court award costs, pursuant to 15 U.S.C. § 1117 (a). As this recovery is subject to the "principles of equity," 15 U.S.C. § 1117(a), this court holds that

14

Famous should be awarded half of the total costs of the action: $206.00.  (Halpern Decl. ¶ 9; Gaffigan Decl. ¶¶ 9–11, Ex. 2.)

## VI. Conclusion

For the reasons set forth above, this Court shall grant Plaintiffs' motion for default judgment and provide each plaintiff with the above-described remedies.

Date: May 8, 2009                               S/Joseph A. Greenaway, Jr.
                                                JOSEPH A. GREENAWAY, JR., U.S.D.J.